Joshua B. Swigart, Esq. (SBN: 225557)
josh@westcoastlitigation.com
**Hyde & Swigart, APC**
2221 Camino Del Rio South, Suite 101
San Diego, CA 92108
Telephone: (619) 233-7770
Fax: (619) 297-1022

*Attorneys for Plaintiff*
Masih Kazerouni

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **MASIH KAZEROUNI, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED,**<br><br>Plaintiff,<br><br>v.<br><br>**BANK OF AMERICA, NATIONAL ASSOCIATION,**<br><br>Defendant. | **Case No:**<br><br>**CLASS ACTION COMPLAINT JURY TRIAL DEMANDED**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff MASIH KAZEROUNI or ("Plaintiff") on behalf of himself and all persons similarly situated submits this Class Action Complaint and allege the following based on personal knowledge as to allegations regarding Plaintiff and based on information and belief as to other allegations.

## I.    INTRODUCTION

1. This is a civil action seeking monetary damages, restitution, and declaratory relief as to Plaintiff's claims against Defendant BANK OF AMERICA, NATIONAL ASSOCIATION ("Defendant").    Plaintiff's claims arise from Defendant's assessment and collection of improper and excessive overdraft fees.

2. In addition, Plaintiff, and the Class Members, also suffered from Defendant's improper practice of reordering of debit card transactions from highest amount to lowest amount and the resulting assessment of overdraft fees even when sufficient funds were present in customer accounts.    This case is brought to remedy Defendant's illegal practices and to recover for these victims.

3. Plaintiff is customers of Defendant's, an international bank worth tens of billions of dollars.    Defendant provides a broad suite of financial services to its membership, which it advertises as being low or no-fee.

4. Moreover, Defendant's overdraft fees on debit card transactions that were assessed after August of 2010 were also improper based on another reason. Starting in August of that year, the Federal Reserve implemented Regulation E (12 C.F.R. § 205.17) ("Reg E") under the Electronic Funds Transfer Act, and banks were obligated to obtain customers' affirmative consent before assessing overdraft fees on debit card transactions.    Defendant did not comply with Reg E and has continued to assess overdraft fees on debit card transactions in violation of federal law.

5. As such, Plaintiff seek to represent a class of all current and former Defendant customers that were improperly assessed overdraft fees due to the reordering of debit card transactions.

## II.    OVERDRAFT FEES

6. In the era of electronic banking and the ubiquitous use of debit cards, the assessment of overdraft fees has become a major profit center for United States banks and credit unions, including Defendant.   For years, banks covered customers who occasionally bounced checks and even did so for a time for customers using debit cards, without charging said customers.   Since the early 1990's, however, banks have devised methods to provide overdraft "protection" for customers and charge them in each instance.   An FDIC report estimated that overdraft fees represent 74 percent of the total service charges that are imposed on deposit accounts in the United States.   A 2008 FDIC study reports that overdraft fees for debit cards can carry an effective annualized interest rate that exceeds 3,500 percent.   In June 2013, the Consumer Finance Protection Bureau released the most recent study examining overdraft fees.   The study results echoed CFPB Director Richard Cordray's fear that "what is often marketed as overdraft protection may be putting consumers at greater risk of harm."   It found that banks spend just 14.4% of the income gained from overdraft fees on the actual overdrafts, and that overdraft fees make up a whopping 27.5% of smaller banks' income.

7. Overdraft charges are a multi billion-dollar industry for banking institutions.   In 2007, banks collected more than $17 billion in overdraft fees.   That number nearly doubled in 2008, as more and more consumers struggled to maintain positive checking account balances.   In 2013, banks brought in $31.9 billion in overdraft charges alone.    With $18.4 billion in assets, Defendant, through multiple offices throughout the nation, and a strong online presence, provided

commercial and retail banking services to a substantial number of customers. Thus, Defendant has been a notable beneficiary of these staggering overdraft charges.

8. Almost by definition, these fees disproportionately affect the poor, who are most likely to maintain low balances. Moebs Services, a research company that has conducted studies for the government as well as banks, estimates that 90 percent of overdraft fees are paid by the poorest 10 percent of banks' customer base. Moreover, these fees have the tendency to create a domino effect because the imposition of a fee on an account with a negative balance will make it less likely that the account holder's balance will reach positive territory, resulting in more fees.

9. Before debit cards existed, banks occasionally extended the courtesy of honoring paper checks written on overdrawn or otherwise deficient accounts for customers who were typically in good standing. Banks extended this courtesy largely because the third party involved in a sales transaction allowed the customer to pay by check, expecting the funds to be available and the check to clear. For example, if a customer wrote a check to purchase groceries, the grocery store would only know whether the check cleared after the groceries had been purchased.

10. However, the same considerations are not present when customers use debit cards. Banks could simply decline to honor debit or point of sale transactions where accounts lack sufficient funds to execute the transactions. Retail and service transactions could still be executed if consumers presented an alternative form of payment. Automated teller machine ("ATM") transactions could still proceed if banks provided a warning that an overdraft fee would be assessed, and customers chose to proceed nevertheless. In fact, until a few years ago, most banks simply declined debit transactions that would overdraw an account.

11. In response to the rampant abuse of overdraft charges by banks, the Board of Governors of the Federal Reserve System implemented Reg E (12 C.F.R. § 205.17) to amend the Electronic Funds Transfer Act to include notice requirements for banks concerning overdraft charges.

12. Pursuant to Reg E, a financial institution may not assess a fee or charge on a consumer's account for paying an ATM or one-time debit card transaction pursuant to the financial institution's overdraft program unless the financial institution provides the customer with written notice, separate from all other information, that describes the institution's overdraft program, and obtains the customer's affirmative consent to the institution's payment of ATM or one-time debit card transactions that would incur an overdraft fee, and provides written confirmation of the consumer's consent along with a statement of informing the consumer of the right to revoke this consent. [*See* 12 C.F.R. § 205.17(b)(1)].

13. For consumers with an account at a financial institution prior to July 1, 2010, the institution cannot assess any fees on a consumer's account on or after August 15, 2010 for paying an ATM or one-time debit card transaction pursuant to the overdraft service unless the institution has complied with 12 C.F.R. § 205.17(b)(1). [*See* 12 C.F.R. § 205.17(c)(1)].

14. For accounts opened on or after July 1, 2010, the financial institution cannot assess any fees on a consumer's account for paying an ATM or one-time debit card transaction pursuant to the overdraft service unless the institution has complied with 12 C.F.R. § 205.17(b)(1). [*See* 12 C.F.R. § 205.17(c)(2)].

15. The debit card transactions and point of sale transactions described herein qualify as an "electronic funds transfer" under the Electronic Funds Transfer Act.

16. Defendant qualifies as a financial institution that provides an overdraft service as contemplated by the Electronic Funds Transfer Act.

17. Instead of simply declining debit transactions when there are insufficient funds, or warning customers that an overdraft fee will be assessed if they proceed with the transaction, Defendant has routinely processed such transactions and then charged their customers an overdraft fees of $35 as a "courtesy pay fee," even when the transaction is for only a few dollars. Thus, Defendant's automatic, fee-based overdraft scheme was and is intentionally designed to maximize overdraft fee revenue.

18. Additionally, as part of Defendant's inequitable motive to generate obscene profits gained through the imposition of unconscionable overdraft fees, Defendant failed to adequately notify customers of Defendant's true overdraft practices and/or their legal rights to opt out of overdraft protection.

19. In many instances, these overdraft fees cost Defendant's account holders hundreds of dollars in a matter of days, or even hours, when they may have been overdrawn by only a few dollars. Even more egregious, customer accounts may not actually be overdrawn at the time the overdraft fees are charged, or at the time of the debit transaction.

## III.   JURISDICTION AND VENUE

20. This Court has original jurisdiction of this action under the Class Action Fairness Act of 2005. Pursuant to 28 U.S.C. §§ 1332(d)(2) and (6), this Court has original jurisdiction because the aggregate claims of the putative Class members exceed $5 million, exclusive of interest and costs, there are at least 100 members of the putative Class, and at least one of the members of each of the proposed Classes is a citizen of a different state than Defendant. This Court also has original jurisdiction of this action under 28 U.S.C. §§ 1331 and 1337 because the claims arise under the laws of the United States, including the Electronic Funds Transfer Act, 15 U.S.C. §§ 1693, et seq.

21. Venue is proper in this district pursuant to 28 U.S.C. § 1391 because Defendant is subject to personal jurisdiction here, regularly conducts substantial business in California, and because a substantial part of the events or omissions giving rise to the claims asserted herein occurred and continue to occur in this district since Plaintiff is a resident of Orange County which is within this district.

## IV. PLAINTIFF

22. Plaintiff is a current customer of Defendant and is a citizen of the County of Orange, State of California.

## V. CLASS ALLEGATIONS

23. Plaintiff bring this action on behalf of himself and all others similarly situated pursuant to Federal Rule of Civil Procedure 23. This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of Rule 23.

24. Plaintiff propose two classes, defined as:

a. All customers of Defendant who, within the applicable statute of limitations, incurred an overdraft fee as a result of Defendant's practices of re-sequencing debit card transactions from highest to lowest, debiting items for which no time-stamp exists before debit card transactions for which a time-stamp exists, or assessing overdraft fees even when a customer has sufficient funds in their account to cover all merchant requests for payment (hereinafter referred to as "the Re-Sequencing Class").

b. All customers of Defendant who were assessed an overdraft fee for an ATM or debit card transaction within four years of the date of filing this Complaint (hereinafter referred to as "the EFTA Class").

25. Plaintiff reserve the right to modify or amend the definitions of the proposed Classes before the Court determines whether certification is appropriate and as

Case # _____ *Kazerouni et. al. v. Bank of America*
**COMPLAINT**                                  **- 7 of 33 -**

the Court may otherwise allow. Modifications will almost certainly be needed due to information obtained during discovery. Based on the current knowledge of Plaintiff, other elements that may be appropriate to include in the definition of the Classes, the definition of an additional class or classes, or as part of individual state subclasses, include Defendant's violations of state statutory protections.

26. Excluded from the Classes are Defendant, its parents, subsidiaries, affiliates, officers, and directors, any entity in which Defendant has a controlling interest, all customers who make a timely election to be excluded, governmental entities, and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

27. The members of the Classes are so numerous that joinder is impractical. The Classes each consist of thousands of members and the identity of those persons is within the knowledge of and can be ascertained only by resort to Defendant's records.

28. The claims of the representative Plaintiff is typical of the claims of the Classes. With respect to the Re-Sequencing Class, Plaintiff, like all other members, was charged overdraft fees by Defendant as a result of their improper practices, to include the re-sequencing of debit card transactions from highest to lowest, and the withdrawal of funds based on transactions for which no time-stamp exists before debit card transactions for which a time-stamp does exist.

29. With respect to the EFTA Class, Plaintiff and all other members were charged overdraft fees on ATM or debit card transactions in violation of EFTA and the regulations based thereupon. The representative Plaintiff, like all members of the Classes, have been damaged by Defendant's misconduct in that Plaintiff have been assessed unfair and unconscionable overdraft charges. Furthermore, the factual basis of Defendant's misconduct is common to members of the

Classes, and represents a common thread of unfair and unconscionable conduct resulting in injury to all members of the Classes.

30. There are numerous questions of law and fact common to the Classes and those common questions predominate over any questions affecting only individual Class members.

31. Among the questions of law and fact common to the Re-sequencing Class are whether Defendant:

   a. Did not clearly disclose and/or refused to allow customers to opt out of the "overdraft protection" programs;

   b. Did not obtain affirmative consent from customers prior to processing transactions that would result in overdraft fees;

   c. Did not alert customers that a debit card transaction, including a cash transaction at an ATM owned by Defendant, would trigger an overdraft fee, and did not provide customers with an opportunity to cancel such transactions;

   d. Manipulated and reordered transactions so as to increase the number of overdraft fees imposed;

   e. Manipulated and reordered debits from highest to lowest in order to maximize the number of overdrafts and, consequently, the amount of overdraft fees;

   f. Affirmatively misrepresented to customers that transactions would be posted in the order received;

   g. Failed to provide customers with accurate balance information;

   h. Delayed posting of transactions by customers using debit cards so that customers were charged overdraft fees on transactions, even though the customers had sufficient funds in their accounts to cover the transactions upon execution;

i.   Breached contractual provisions and/or the covenant of good faith and fair dealing through their overdraft policies and practices;

j.   Required customers to enter into standardized account agreements which included unconscionable provisions;

k.   Converted money belonging to Plaintiff and other members of the Classes through its overdraft policies and practices; and

l.   Was unjustly enriched through its overdraft policies and practices.

32. Among the questions of law and fact common the EFTA Class are whether Defendant:

a.   Provided customers with a notice describing its overdraft services that complied with 12 C.F.R. §§ 205.17(b)(1)(i), (d);

b.   Provided customers with a reasonable opportunity to affirmatively consent, or opt in, to overdraft services in accordance with 12 C.F.R. § 205.17(b)(1)(ii);

c.   Obtained customers' affirmative consent, or opt-in, to overdraft services in accordance with 12 C.F.R. § 205.17(b)(1)(iii);

d.   Provided customers with confirmation of their consent in accordance with 12 C.F.R. § 205.17(b)(1)(iv); and

e.   Assessed overdraft fees in violation of EFTA.

33. Other questions of law and fact common to the Classes include:

a.   The proper method or methods by which to measure damages; and

b.   The declaratory relief to which the Classes are entitled.

34. Plaintiff's claims are typical of the claims of other members of the Re-sequencing and EFTA Classes, in that they arise out of the same wrongful overdraft policies and practices and the same or substantially similar unconscionable provisions of Defendant's account agreements and other related documents.

35. Plaintiff's claims are typical of the claims of other members of the EFTA Class, in that they are based on EFTA and arise from the same wrongful overdraft policies and practices. Plaintiff have suffered the harm alleged and have no interests antagonistic to the interests of any other member of the Class.

36. Plaintiff is committed to the vigorous prosecution of this action and have retained competent counsel experienced in the prosecution of class actions. Plaintiff is adequate representatives and will fairly and adequately protect the interests of the Classes.

37. A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Since the amount of each individual Class member's claim is small relative to the complexity of the litigation, and due to the financial resources of Defendant, no Class member could afford to seek legal redress individually for the claims alleged herein. Therefore, absent a class action, the Class members will continue to suffer losses and Defendant's misconduct will proceed without remedy.

38. Even if Class members themselves could afford such individual litigation, the court system could not. Given the complex legal and factual issues involved, individualized litigation would significantly increase the delay and expense to all parties and to the Court. Individualized litigation would also create the potential for inconsistent or contradictory rulings. By contrast, a class action presents far fewer management difficulties, allows claims to be heard which might otherwise go unheard because of the relative expense of bringing individual lawsuits, and provides the benefits of adjudication, economies of scale, and comprehensive supervision by a single court.

## VI. <u>COMMON FACTUAL ALLEGATIONS</u>

### A. Defendant

39. Defendant is global bank worth tens of billions of dollars.

40. Defendant is in the business of providing customers with a variety of banking products and services. Customers who open a checking account are provided with a debit card, also known as a check card or ATM card. Through such debit cards, customers can engage in transactions using funds which are withdrawn from their accounts by engaging in "debit" or "point of sale" ("POS") transactions, or may withdraw money from their accounts at ATMs. Whether the card is used to execute POS transactions or to withdraw cash from ATMs, the transaction is processed electronically. As a result, Defendant is notified instantaneously when the card is swiped, and has the option to accept or decline transactions at such time.

41. Defendant employs sophisticated software to automate its overdraft systems. These programs maximize the number of overdrafts, and thus, the amount of overdraft fees charged per customer. Defendant utilizes this software system to generate overdraft fees. Customers at all of Defendant's branches and online suffered from the same policies and systems in regard to overdraft fees.

42. As a result of Defendant's manipulation and alteration of customers' transactions records, funds in a customer's account are depleted more rapidly and more overdraft fees are likely to be charged for multiple smaller transactions. Indeed, overdraft charges are likely to occur at times when, but for the manipulation and alteration, there would be funds in the account and no overdraft would occur. For example, if a customer, whose account had a $50 balance at the time several transactions posted, made four transactions of $10 and then one subsequent transaction of $100, Defendant would reorder the debits from largest to smallest, imposing four overdraft fees on the customer. Conversely, if the $100 transaction were debited last – consistent with the actual order of transactions – only one overdraft fee would be assessed. [*See* FDIC Study of Bank Overdraft Programs, November 2008, available at www.fdic.gov/bank/analytical/overdraft/ at 11, n.12].

## B. Defendant's Relevant Customer Documents Regarding Overdrafts

43. Plaintiff and all members of the Classes maintain or maintained a checking account with Defendant. The terms of the checking accounts are contained in standardized account holder agreements, presented to customers on a "take it or leave it" basis, drafted and imposed by Defendant, which has vastly superior bargaining strength, and thus constitute agreements of adhesion. Defendant's standardized account documents were revised periodically during the relevant time period. Depending on the version of the contracts, a variety of other documents were referenced therein and these documents are purported to also bind customers.

## C. Defendant's Reordering Of Checking Account Transactions

44. To maximize overdraft revenue, Defendant has manipulated and reordered debits from highest to lowest during given periods of time. It has reordered debit card transactions for no reason other than to increase the number of exorbitant overdraft fees. This practice violates the parties' contracts and the covenant of good faith and fair dealing.

45. Transactions involving debit cards, including the withdrawal of cash from ATMs and POS transactions with vendors, are processed electronically. As a result, Defendant is notified instantaneously when the customer's debit card is swiped, and has the option to accept or decline these transactions.

46. Notwithstanding the instantaneous nature of these electronic debit card transactions, under Defendant's posting system, charges are not posted in the order in which they are assessed or received. Defendant developed a policy and employs a practice whereby debits are posted to customer accounts out of chronological order for the sole purpose of maximizing the number of overdraft transactions and, therefore, the amount of overdraft fees charged to customers.

47. Instead of processing such transactions in chronological order, Defendant processes them starting with the largest debit and ending with the smallest debit, so as to generate the largest possible number of overdrafts and the greatest possible amount of overdraft fees.

48. Defendant would have no higher expenses and would face no greater risk if it were to order transactions chronologically or from smallest to largest.

49. Defendant often posts debit card transactions that have accumulated over multiple days on a single date. When the group of charges is eventually posted to the customer's account, they are posted in order of largest to smallest – not in the order in which they were received or in the order in which they were charged. This delayed posting results in the imposition of multiple overdraft fees that would not otherwise be imposed. The delayed posting also prevents customers from ascertaining the accurate balances in their accounts.

50. Defendant enforces this policy whereby charges assessed are posted to customers' accounts in a non-chronological order, from highest to lowest, and are held for multiple days and then batched together, to maximize the number of overdraft transactions and fees. These processing practices substantially increase the likelihood that customers' smaller charges will result in multiple overdraft fees. The practices provide Defendant with substantially higher service fee revenues than it would otherwise achieve absent these practices.

51. As a result of these and other practices, Plaintiff and members of the Re-sequencing Class have been assessed overdraft fees for transactions, which occurred when they actually had sufficient funds in their accounts to cover those transactions.

///

///

///

**D. Defendant's Failure To Notify Customers Of Overdrafts Or Advise Customers Of Their Right To Opt Out**

52. At the time debit cards are used in POS transactions or at ATMs, Defendant is able to determine instantaneously whether there are sufficient funds in a customer's account to cover that particular transaction. Defendant has the technological capability to decline transactions, or notify customers at that very moment that the particular debit card transaction would result in an overdraft. Prior to the effective date of the opt in/opt out requirements of the EFTA (the "Effective Date"), Defendant could have given customers the option to decline the transaction to avoid incurring overdraft fees, but failed to do so because it sought to maximize the amount of revenue generated through the assessment of overdraft fees.

53. Notwithstanding its technological capabilities and actual knowledge, Defendant failed to provide notice to Plaintiff and the Class that a particular debit card transaction would result in an overdraft and, hence, an overdraft fee.

54. Defendant also failed to make Plaintiff and the Class members aware that they could opt out of their overdraft scheme upon request, thereby avoiding any overdraft fees from being charged.

**E. Defendant's Overdraft Policies And Practices Are Contrary To Best Practices**

55. By engaging in the conduct described herein, Defendant has failed to follow the list of "best practices" for overdraft programs set forth in the "Joint Guidance on Overdraft Protection Programs" ("Joint Guidance") issued by the United States Department of the Treasury, the Office of the Comptroller of the Currency, the Board of Governors of the Federal Reserve System, the Federal Deposit Insurance Corporation, and the National Credit Union Administration (collectively the "Agencies"). These "best practice" recommendations include:

"Provide election or opt-out of service.   Obtain affirmative consent of consumers to receive overdraft protection.   Alternatively, where overdraft protection is automatically provided, permit consumers to 'opt-out' of the overdraft program and provide a clear consumer disclosure of this option."  [*See* 70 F.R. 9127-01, 9132].

56. According to rules proposed by the Agencies: "Injury [caused by overdraft charges] is not outweighed by countervailing benefits… This is particularly the case for ATM withdrawals and POS debit card transactions where, but for the overdraft service, the transaction would typically be denied and the consumer would be given the opportunity to provide other forms of payment without incurring any fee." [*See* 73 F.R. 28904-01, 28929 (May 19, 2008)].

57. The Joint Guidance also advises banks to "[a]lert customers before a transaction triggers any fees.  When consumers attempt to withdraw or transfer funds made available through an overdraft protection program, Defendant should provide a specific consumer notice, where feasible, that completing the withdrawal may trigger the overdraft fees."  [70 F.R. 9127, 9132].  The Joint Guidance further advises that "[t]his notice should be presented in a manner that permits consumers to cancel the attempted withdrawal or transfer after receiving the notice." [*Id*.].

58. Similarly, the list of "best practices" recommended in "Overdraft Protection: A Guide for Bankers," issued by the American Bankers Association, includes offering customers the option of "opting out" of any overdraft programs, and informing customers, before they access funds, that a particular point of sale or ATM transaction will cause them to incur an overdraft fee.

59. Defendant's overdraft policies make it difficult for customers to avoid injury even if they carefully track the balance in their account.  In fact, the Agencies have stated that injury resulting from such policies "is not reasonably avoidable" by the consumer.  [73 F.R. 28904-01, 28929].  "It appears that consumers cannot

HYDE & SWIGART
Consumer Protection Attorneys

reasonably avoid this injury if they are automatically enrolled in an institution's overdraft service without having an opportunity to opt out. Although consumers can reduce the risk of overdrawing their accounts by carefully tracking their credits and debits, consumers often lack sufficient information about key aspects of their account. For example, a consumer cannot know with any degree of certainty when funds from a deposit or a credit for a returned purchase will be made available."

60. On October 6, 2009, the Center for Responsible Lending issued a report entitled "Overdraft Explosion: Bank Fees for Overdrafts Increase 35% in Two Years." The report found that it is now "standard procedure to automatically enroll checking account customers in their most expensive overdraft loan program." The report finds that debit card transactions account for more overdraft fees than traditional checks or any other type of transaction, even though "debit card transactions and ATM withdrawals . . . could easily be denied for no fee." The report also finds that overdraft fees increased 35 percent from 2006 to 2008, and that over 50 million Americans overdrew their accounts in a 12-month period, with 27 million accounts incurring five or more overdraft fees.

61. A chart from the research company Moebs Services shows that in every year from 1992 to 2009, banks gained increased revenues from overdraft fees:



**Bank and Credit Union Revenue from Overdraft Programs and Insufficient-Funds Fees, In $Billions**

### F. **Defendant's Unconscionable Provisions And Policies**

62. Defendant's overdraft policies and practices are unconscionable in the following respects, among others:

    a. Defendant did not disclose or reasonably disclose to customers that they had the option to "opt out" of their overdraft scheme;

b. Defendant did not obtain affirmative consent from checking account customers prior to processing a transaction that would overdraw the account and result in an overdraft fee;

c. Defendant did not alert their customers that a debit card transaction would trigger an overdraft, and did not provide the customer the opportunity to cancel that transaction, before assessing an overdraft fee;

d. Defendant used unduly discretionary power to assess fees even at times when no economic argument could be made for such fees;

e. The account agreements and related documents are contracts of adhesion in that they are standardized forms, imposed and drafted by Defendant, which had vastly superior bargaining strength, and only allow customers the opportunity to adhere to them or reject them entirely; and

f. The account agreements provided to customers were ineffective, ambiguous, deceptive, unfair, and misleading to any extent they allowed Defendant to perpetrate the grossly improper acts described herein.

## G. Defendant's Overdraft Practices Harmed Plaintiff and The Defendant Class

63. Defendant's wrongful overdraft policies and practices described above harmed Plaintiff and members of the Classes.

64. Plaintiff have had Plaintiff's debit card transactions manipulated and reordered by Defendant.  If Defendant had not done so, Plaintiff would not have been assessed as many overdraft fees.  Plaintiff paid multiple overdrafts only because of this improper practice.

65. Plaintiff have been assessed overdrafts in violation of the plain terms of EFTA. Similarly, if Defendant had not violated EFTA, Plaintiff would not have been assessed as many overdraft fees.  Plaintiff paid multiple overdraft fees which EFTA prohibited Defendant from charging.

66. In this lawsuit, Plaintiff do not challenge all of the overdraft fees Plaintiff were assessed. Rather, Plaintiff challenge only those that occurred as a direct result of improper practices of Defendant, such as the practice of posting debit card transactions in high to low order.

67. Defendant never notified Plaintiff at the time it executed the purported insufficient funds transactions that Plaintiff's checking accounts were overdrawn or that Plaintiff would be charged an overdraft fee as a result of the transactions. Furthermore, Defendant paid, rather than returned, each debit card transactions described above even though Plaintiff's accounts purportedly lacked sufficient funds to cover the transactions.

68. The overdraft fees assessed Plaintiff is representative of millions of dollars of overdraft fees that Defendant wrongfully assessed and deducted from customer accounts. These wrongful takings are especially egregious considering the fact that Defendant approved each transaction and knew at the time of approval whether there were sufficient funds in the account to cover the transaction.

## H. **The Damages Sustained By Plaintiff And The Classes**

69. Defendant's overdraft policies make it difficult for a customer to avoid injury even if the customer keeps close track of the balance in his or her account. In fact, the Agencies have stated that "injury" resulting from such policies "is not reasonably avoidable" by consumers. [73 F.R. 28904-01, 28929]. "It appears that consumers cannot reasonably avoid this injury if they are automatically enrolled in an institution's overdraft service without having an opportunity to opt out. Although consumers can reduce the risk of overdrawing their accounts by carefully tracking their credits and debits, consumers often lack sufficient information about key aspects of their account. For example, a consumer cannot know with any degree of certainty when funds from a deposit or a credit for a returned purchase will be made available." [*Id*.].

70. Thus, as a consequence of Defendant's overdraft policies and practices, Plaintiff and the Re-sequencing Class have been wrongfully forced to pay overdraft fees. Defendant has improperly deprived Plaintiff and the Classes of significant funds, causing ascertainable monetary losses and damages.

71. As a consequence of Defendant's improper overdraft fees, Plaintiff and the Classes have been wrongfully deprived of funds to which Defendant had no legitimate claim.

## I. Defendant Violates The EFTA

72. Under the EFTA, financial institutions such as Defendant – as of July 1, 2010 if an account was opened on or after July 1, 2010, or August 15, 2010 if an account was opened prior to July 1, 2010 – may not assess an overdraft fee to a consumer customer for paying an ATM or one-time debit card transaction unless the institution first (i) provided the customer with notice of the overdraft "services," (ii) provided the customer with an opportunity to opt-in to such service, (iii) obtained the customer's affirmative consent to opt-in, and (iv) provided confirmation of the customer's consent and a statement informing the customer of the right to revoke such consent. [*See, e.g.,* 12 C.F.R. § 205.17(b)(1)(i)-(iv)].

73. Defendant failed to comply with these and other EFTA requirements. [*See* 15 U.S.C. §§ 1693b, 1693c, 12 C.F.R. § 205.17]. Nonetheless, after the Effective Dates, Defendant, in direct violation of EFTA, and to the detriment of Plaintiff and the EFTA Class, continued to assess overdraft on ATM and one-time debit card transactions.

74. All conditions precedent to the relief sought herein have either occurred or have been performed or waived.

///

///

Case # _____ *Kazerouni et. al. v. Bank of America*
**COMPLAINT**                              **- 21 of 33 -**

# VII.   CAUSES OF ACTION

## First Cause of Action

### *Breach of Contract and Breach of the Covenant of Good Faith and Fair Dealing*

75. Plaintiff repeat, re-allege and incorporate herein by reference all paragraphs above.

76. Plaintiff and Defendant have contracted for bank account deposit, checking, ATM, and debit card services.  As described above, the actions taken by Defendant have violated the specific terms of the account agreements with customers, including other documents referenced therein.  Defendant is liable for the losses of Plaintiff and the Classes that have resulted from Defendant's breaches of the parties' contractual agreements.

77. Under the laws of the states where Defendant does business, good faith is an element of every contract pertaining to the assessment of overdraft fees. Whether by common law or statute, all such contracts impose upon each party a duty of good faith and fair dealing.  Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit – not merely the letter – of the bargain.  Put differently, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form.  Evading the spirit of the bargain and abusing the power to specify terms constitute examples of bad faith in the performance of contracts.

78. Subterfuge and evasion violate the obligation of good faith in performance even when an actor believes his conduct to be justified.  A lack of good faith may be overt or may consist of inaction, and fair dealing may require more than honesty.  Examples of violations of good faith and fair dealing are evasion of the spirit of the bargain, willful rendering of imperfect performance, abuse of a power to

specify terms, and interference with or failure to cooperate in the other party's performance.

79. Defendant has breached the covenant of good faith and fair dealing through its overdraft policies and practices as alleged herein.

80. Plaintiff and the Classes have performed all, or substantially all, of the obligations imposed on them under the account agreements.

81. Plaintiff and members of the Classes have sustained damages as a result of Defendant's breaches of the account agreements, as well as the further breaches of the account agreements as modified by the covenant of good faith and fair dealing.

## Second Cause of Action

### *Unconscionability*

82. Plaintiff repeat, re-allege and incorporate herein by reference all of the paragraphs above.

83. Defendant's overdraft policies and practices are substantively and procedurally unconscionable in the following respects, among others:

   a. Prior to the Effective Date, Defendant did not disclose or reasonably disclose to customers that they had the option to "opt out" of the overdraft scheme;

   b. Prior to the Effective Date, Defendant did not obtain affirmative consent from checking account customers prior to processing a transaction that would overdraw the account and result in an overdraft fee;

   c. Defendant did not alert customers that a debit card transaction would trigger an overdraft, and did not provide the customer the opportunity to cancel that transaction, before incurring an overdraft fee;

d. The account agreements are contracts of adhesion in that they are standardized forms, imposed and drafted by Defendant, which are parties of vastly superior bargaining strength, and only allows the customer the opportunity to adhere to them or reject them entirely;

e. The account agreements provided to customers are ineffective, ambiguous, deceptive, unfair, and misleading in that they do not reveal the improper methods utilized by Defendant to generate excessive overdraft fees; and,

f. The account agreements authorize Defendant to take nearly any action, including wholly changing the contract, assessing overdraft fees, manipulating customer transactions, and otherwise taking grossly unfair action to harm customers.

84. Considering the great business acumen and experience of Defendant in relation to Plaintiff and the members of the Classes, the great disparity in the parties' relative bargaining power, the inconspicuousness and incomprehensibility of the contract language at issue, the oppressiveness of the terms, the commercial unreasonableness of the contract terms, the purpose and effect of the terms, the allocation of the risks between the parties, and similar public policy concerns, these provisions are unconscionable and, therefore, unenforceable as a matter of law.

85. The imposition of overdraft charges that exceed the amount overdrawn (e.g., the imposition of a $35 charge on a transaction of less than $10) is itself unconscionable. Such charges are not reasonably related to Defendant's cost of covering the overdraft and/or their risk of nonpayment (where Defendant pays the overdraft), or to the cost of returning the item unpaid (where Defendant does not pay the overdraft). This is particularly true when the balance of actual funds has not even fallen below zero.

86. Plaintiff and members of the Classes have sustained damages as a result of Defendant's unconscionable policies and practices as alleged herein.

## Third Cause of Action

### *Conversion*

87. Plaintiff repeat, re-allege and incorporate herein by reference all of the above paragraphs.

88. Defendant had, and continues to have, a duty to maintain and preserve customers' checking accounts and to prevent their diminishment through its own wrongful acts.

89. Defendant has wrongfully collected overdraft fees from Plaintiff and the members of the Re-sequencing Class, and has taken specific and readily identifiable funds from their accounts in payment of these fees in order to satisfy them.

90. Defendant has, without proper authorization, assumed and exercised the right of ownership over these funds, in hostility to the rights of Plaintiff and the members of the Class, without legal justification.

91. Defendant continues to retain these funds unlawfully without the consent of Plaintiff or members of the Class.

92. Defendant intends to permanently deprive Plaintiff and the members of the Class of these funds.

93. These funds are properly owned by Plaintiff and the members of the Class, not Defendant, which now claims that they are entitled to their ownership, contrary to the rights of Plaintiff and the members of the Class.

94. Plaintiff and the members of the Class are entitled to the immediate possession of these funds.

95. Defendant has wrongfully converted these specific and readily identifiable funds.

96. Defendant's wrongful conduct is continuing.

97. As a direct and proximate result of this wrongful conversion, Plaintiff and the members of the Class have suffered and continue to suffer damages.

98. By reason of the foregoing, Plaintiff and the members of the Class are entitled to recover from Defendant all damages and costs permitted by law, including all amounts that Defendant has wrongfully converted.

## Fourth Cause of Action

### *Unjust Enrichment*

99. Plaintiff repeat, re-allege and incorporate herein by reference all of the above paragraphs.

100. Plaintiff, on behalf of themselves and the Re-sequencing Class, assert a common law claim for unjust enrichment. This claim is brought solely in the alternative and Plaintiff concede that this claim cannot survive if his contractual claims succeed. If, however, the parties' contracts are deemed unconscionable or otherwise unenforceable for any reason, unjust enrichment will dictate that Defendant disgorge all improperly assessed overdraft fees.

101. By means of Defendant's wrongful conduct alleged herein, Defendant knowingly provided banking services to Plaintiff and members of the Class that are unfair, unconscionable, and oppressive.

102. Defendant knowingly received and retained wrongful benefits and funds from Plaintiff and members of the Class. In so doing, Defendant acted with conscious disregard for the rights of Plaintiff and members of the Class.

103. As a result of Defendant's wrongful conduct as alleged herein, it has been unjustly enriched at the expense of, and to the detriment of, Plaintiff and members of the Class.

104. Defendant's unjust enrichment is traceable to, and resulted directly and proximately from, the conduct alleged herein.

105. Under the common law doctrine of unjust enrichment, it is inequitable for Defendant to be permitted to retain the benefits it received, and is still receiving, without justification, from the imposition of overdraft fees on Plaintiff and members of the Classes in an unfair, unconscionable, and oppressive manner. Defendant's retention of such funds under circumstances making it inequitable to do so constitutes unjust enrichment.

106. The financial benefits derived by Defendant rightfully belong to Plaintiff and members of the Class. Defendant should be compelled to disgorge in a common fund for the benefit of Plaintiff and members of the Class all wrongful or inequitable proceeds received by them. A constructive trust should be imposed upon all wrongful or inequitable sums received by Defendant traceable to Plaintiff and the members of the Class.

107. Plaintiff and members of the Class have no adequate remedy at law.

## **Fifth Cause of Action**

### *Violations of the Electronic Funds Transfer Act and Regulations Such as §15 U.S.C. §1693 and 12 C.F.C. §205*

108. Plaintiff repeat, re-allege and incorporate herein by reference all of the paragraphs above.

109. Plaintiff allege this claim on behalf of themselves and the EFTA Class members who have been assessed one or more overdraft fees or charges based on ATM or debit card transactions.

110. Plaintiff, on behalf of themselves and the EFTA Class, asserts that Defendant failed to:

a. Provide customers with a notice describing their overdraft services that complies with 12 C.F.R. §§ 205.17(b)(1)(i), (d);

b. Provide customers with a reasonable opportunity to affirmatively consent, or opt in, to overdraft services in accordance with 12 C.F.R. § 205.17(b)(1)(ii);

c. Obtain customers' affirmative consent, or opt-in, to overdraft services in accordance with 12 C.F.R. § 205.17(b)(1)(iii); or

d. Provide customers with confirmation of their consent in accordance with 12 C.F.R. § 205.17(b)(1)(iv).

111. Nonetheless, Defendant imposed overdraft fees on them based on ATM or debit card transactions in violation of 12 C.F.R. §§ 205.17(b), (c).

112. As a result of Defendant's violations of EFTA, Defendant is liable to Plaintiff and the EFTA Class for actual and statutory damages pursuant to 15 U.S.C. § 1693m.

113. As a result of Defendant's violations of the EFTA, Defendant is liable to Plaintiff and the EFTA Class for actual and statutory damages and Plaintiff and the Class are entitled to recover costs of suit and their reasonable attorneys' fees.

## Sixth Cause of Action

### *Violations of California Business and Professions Code §17200, et. seq.*

120. Plaintiff repeat, re-allege and incorporate herein by reference the above allegations as if fully stated herein.

121. "Unfair competition" is defined in Business and Professions Code Section § 17200 as encompassing any one of the five types of business "wrongs," three of which are at issue here: (1) an "unlawful" business act or practice; (2) an "unfair"

business act or practice; and (3) a "fraudulent" business act or practice. The definitions in § 17200 are disjunctive, meaning that each of these five "wrongs" (Plaintiff allege three of them here) operates independently from the others.

122. Plaintiff and Defendant are both "person[s]" as defined by California Business & Professions Code § 17201. Section 17204 authorizes a private right of action on both an individual and representative basis.

### a.    "Unlawful" Prong

123. Because Defendant has violated the EFTA, Defendant has violated California's Unfair Competition Law, Business & Professions Code §§ 17200 et seq., which provides a cause of action for an "unlawful" business act or practice perpetrated on members of the California public.

124. There were reasonably available alternatives to further Defendant's legitimate business interest, other than the conduct described herein.

125. Plaintiff and the putative class reserve the right to allege other violations of law, which constitute other unlawful business practices or acts, as such conduct is ongoing and continues to this date.

### b.    "Unfair" Prong

126. Defendant's actions and representations constitute an "unfair" business act or practice under § 17200, in that Defendant's conduct is substantially injurious to consumers, offends public policy, and is immoral, unethical, oppressive, and unscrupulous as the gravity of the conduct outweighs any alleged benefits attributable to such conduct. Without limitation, it is an unfair business act or practice for Defendant to knowingly and negligently misrepresent to the consuming public, including Plaintiff, that transactions are posted in the order received when they are actually re-ordered to generate overdraft fees, as it is to re-

order these transactions to generate obscene profits for Defendant at the expense of consumers, and to fail to make required disclosures to Plaintiff and Consumers about overdraft protection in violation of the EFTA.   Defendant's business practices, and each of them, are "unfair" because they offend established public policy and/or are in moral, unethical, oppressive, unscrupulous and/or substantially injurious to consumers, who are misled as to the features of their accounts and accordingly make transactions that result in multiple, expensive, overdraft fees.

127.   At a date presently unknown to Plaintiff, but at least four years prior to the filing of this action, and as set forth above, Defendant has committed acts of unfair competition as defined by Business & Professions Code §§ 17200 et seq. as described herein.

128.   Plaintiff and other members of the class could not reasonably have avoided the injury suffered by each of them. Plaintiff reserve the right to allege further conduct that constitutes other unfair business acts or practices.   Such conduct is ongoing and continues to this date.

129.   Defendant could have and should have furthered its legitimate business interests by expressly revealing to Plaintiff and the members of the Classes the true features and effects of overdraft "protection."   It would not have been unreasonably difficult for Defendant to have done so.

c.   "Fraudulent" Prong

130.   Defendant's claims and statements pertaining to the features of its accounts were false, misleading and/or likely to deceive the consuming public within the meaning of § 17200.   Without limitation, it is a fraudulent act or business act or practice for Defendant to knowingly or negligently represent to Plaintiff, whether by conduct, orally or in writing by intentionally failing to offer a meaningful opportunity to opt out of overdraft protection, to misrepresent that charges are

processed in the order received, and to re-order transactions to generate the maximum amount of overdraft fees attributable to Plaintiff and the Class Members.

131.  Plaintiff reserve the right to allege further conduct that constitutes other fraudulent business acts or practices.  Such conduct is ongoing and continues to this date.

132.  The fraudulent, unlawful and unfair business practices and false and misleading representations of Defendant, as described above, presents a continuing threat to consumers in that they will continue to be misled into incurring overdraft fees.

133.  As a direct and proximate result of the aforementioned acts and representations of Defendant, Defendant received and continues to hold monies rightfully belonging to Plaintiff and other similarly situated consumers who were led to do business with Defendant due to the unlawful acts of Defendant.

134.  Defendant has engaged in unlawful, unfair and fraudulent business acts or practices, entitling Plaintiff to judgment and equitable relief against Defendant, as set forth in the Prayer for Relief. Pursuant to Business & Professions Code § 17203, as result of each and every violation of the UCL, which are continuing, Plaintiff is entitled to restitution from against Defendant, as set forth in the Prayer for Relief.

135.  Plaintiff and members of the classes have suffered injury in fact and have lost money as a result of Defendant's unfair competition.  Plaintiff and members of the classes have been injured because they incurred overdraft fees pertaining to their accounts with Defendant.

136.  Defendant, through its acts of unfair competition, has unfairly acquired money from Plaintiff and members of the classes. It is impossible for the Plaintiff to determine the exact amount of money that Defendant has obtained without a

detailed review of the Defendant's books and records. Plaintiff request that this Court restore this money and enjoin Defendant from continuing to violate California Business & Professions Code § 17200 et seq., as discussed above.

137. Plaintiff further seek an Order requiring Defendant to make full restitution of all moneys wrongfully obtained and disgorge all ill-gotten revenues and/or profits, together with interest thereupon.

138. Plaintiff also seek attorneys' fees and costs pursuant to, inter alia, California Civil Code section 1021.5.

## VIII. <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiff and the Classes demand a jury trial on all claims so triable and judgment as follows:

- Declaring Defendant's overdraft fee policies and practices to be wrongful, unfair, unconscionable, and in violation of the EFTA;

- Awarding restitution of all overdraft fees at issue paid to Defendant by Plaintiff and the Classes as a result of the wrongs alleged herein in an amount to be determined at trial;

- Compelling disgorgement of the ill-gotten gains derived by Defendant from its misconduct;

- Awarding actual damages in an amount according to proof;

- Awarding punitive and exemplary damages;

- Awarding statutory damages;

- Awarding pre-judgment interest at the maximum rate permitted by applicable law;

- Reimbursing all costs and disbursements accrued by Plaintiff in connection with this action, including reasonable attorneys' fees pursuant to applicable law; and
- Awarding such other relief as this Court deems just and proper.

## XI. TRIAL BY JURY

Pursuant to the Seventh Amendment to the Constitution of the United States of America, Plaintiff is entitled to, and demands, a trial by jury.

Date: 3/6/18                                           **Hyde & Swigart, APC**

                                                        By: /s/ Joshua B. Swigart
                                                            Joshua B. Swigart, Esq.
                                                            Attorney For Plaintiff